v.

STATE of Alaska, DFYS, Appellee.

No. S–9578.

Supreme Court of Alaska.

March 23, 2001.

⊙═6(2)

Robert S. Noreen, Law Office of Robert S. Noreen, Fairbanks, for Appellant.

Susan Paterson, Assistant Attorney General, Fairbanks, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

The superior court terminated N.A.'s parental rights to her two daughters because of N.A.'s alcohol dependency, her mental impairment causing an inability to control her rage, and her continuing choice to live with a convicted sex offender. N.A. appeals, arguing that the superior court's failure to hold a permanency hearing violated due process and that the court erred in concluding that the state made active efforts to provide remedial services and rehabilitative programs designed to prevent the termination of her parental rights. We affirm.

## II. FACTS AND PROCEEDINGS

### A. N.A.'s General Background

N.A. is the biological mother of five children: three girls, currently ages thirteen, seven, and five; and two boys, ages eleven and ten.

At various times between 1988 and 1997, doctors have diagnosed N.A. with alcohol dependency, borderline personality disorder, organic brain disorder, and alcohol amnestic disorder. Paul Craig, Ph.D., a neuropsychologist who diagnosed N.A. with alcohol amnestic disorder, stated that N.A. "may not be capable of learning the skills necessary to function adequately as a parent." At least

once, N.A. admitted to physically and verbally assaulting her sons.

In the past ten years, N.A. has entered substance abuse treatment programs three times. She completed the first program successfully, staying sober during her 1993 pregnancy. The last two attempts were unsuccessful: one program discharged her for disruptive behavior, and N.A. left the other. While N.A. had some periods of sobriety, she had at least three relapses between May 1998 and the termination hearing in November 1999.

N.A. lived with Reginald Smith, a convicted sex offender. Their relationship began in 1988. At that time, Smith was on probation after serving a year in jail on the felony charge of second degree sexual abuse of a minor. One condition of Smith's probation prohibited him from being alone with children. Smith is the father of N.A.'s last four children. At one time, N.A. alleged that Smith sexually abused her youngest daughter, but N.A. has since recanted that statement.

N.A. and Smith's relationship has been marked by violent episodes. N.A. alleged that Smith struck her with his fist and broke her jaw in 1990. In 1992 N.A. stabbed Smith in the chest; Smith was hospitalized for several weeks but recovered. In a later argument with Smith, N.A. broke the windshield of Smith's car and tried to slash his tires.

### B. State Involvement with N.A. and Her Children

The Division of Family and Youth Services has been involved with N.A. since the birth of her first child, a daughter, in 1987. After several reports of parental neglect, this child was placed with her biological father.

In 1989 N.A. and Smith had their first child, a boy. In 1990 N.A. gave birth to their second son.

In 1991 N.A. left her home intoxicated, leaving her two infant sons alone with Smith, a violation of Smith's parole conditions. The state took temporary custody of the boys. While in state custody, doctors examined the boys and diagnosed them as being at high risk for developmental problems. The court found the boys to be children in need of aid and committed the boys to state custody.

In August 1992 N.A. was convicted of felony assault. She thereafter violated her probation and was court-ordered into a residential alcohol treatment program. From late 1992 through mid–1993, she successfully completed the Dena A Coy residential alcohol program for pregnant women in the Northstar Center in Anchorage. In May 1993 she gave birth to a girl. N.A. completed an alcohol treatment aftercare program in Fairbanks with the Regional Center for Alcohol and Other Addictions.

In 1994 the superior court terminated N.A.'s parental rights to the boys because her alcohol dependency and mental impairment caused her sons to be severely developmentally delayed and to require special care that she was incapable of giving. While the appeal of the termination decision was pending, N.A. gave birth to a second baby girl in June 1995.

In early 1996 this court reversed the termination of N.A.'s parental rights to the boys. We interpreted former AS 47.10.010(a)(2)(A) to require the state to show that a child had no parent able and willing to provide care.[1] Because N.A., though unable to provide care, was willing to do so, we reversed the termination of her parental rights.[2] We also held that the evidence did not support the finding that the boys would face "an imminent risk of substantial physical harm."[3] In June the boys were placed back in N.A.'s care.

In April 1997 a division social worker found N.A. intoxicated while attempting to care for a child. The police arrested N.A. for

1. *See In re S.A.*, 912 P.2d 1235, 1242 (Alaska 1996).

2. *Id.* The legislature would later expressly override our decision by the 1998 revision of the CINA statutes, which allowed termination of parental rights when a parent was willing but unable to care for a child and eliminated the requirement that the risk of harm to the child be imminent. *See* ch. 99, § 1, SLA 1998.

3. *S.A.*, 912 P.2d at 1238.

probation violation, and the division petitioned for temporary custody of all four children. N.A. agreed to enter residential alcohol treatment; pending an opening in such a program, N.A. was released from jail. The girls were returned to N.A. shortly thereafter, but the state retained temporary custody of the boys.

In October of the same year, N.A. agreed to state custody for her boys for two years or until she would be permitted to take physical custody of them again in a residential alcohol treatment program. In November, when N.A. entered the Women's and Children's Residential Program (WCRP), N.A.'s daughters were placed in state custody while N.A. began the alcohol treatment program.

Within two months, N.A.'s placement at WCRP ended. Program counselors transported her to the Fairbanks Memorial Hospital mental health ward after she confronted another patient, threatened to hit a patient with a coffee pot, and used profane language toward another patient and staff in front of children. Three days later, WCRP discharged N.A. and recommended a dual treatment center—a center that could provide treatment for both alcoholism and mental health problems—in Anchorage. N.A. preferred to stay in Fairbanks. Her case worker agreed and had N.A. placed at the Tanana Chiefs Conference (TCC) Paul Williams House. N.A.'s children remained in state custody.

In late January 1998 N.A. entered the Fairbanks Rescue Mission Fresh Start Program, which had experience working with dual-diagnosis patients. She left the program without completion in mid-April 1998. The Fairbanks Rescue Mission concluded that N.A. did not benefit from group living situations and recommended individual assisted living and an adult conservator. N.A. was placed back at the TCC Paul Williams House. N.A.'s children remained in state custody.

On May 8 N.A. began a weekend drinking binge. On May 10 N.A. arrived at the Paul Williams House intoxicated. After assaulting another client, N.A. was told to leave, and to return when sober. N.A.'s parole officer and police located her the following day,

found her intoxicated, and arrested her for violating probation. N.A. was placed in the Fairbanks Correctional Center. N.A. was released from jail on August 3.

On October 5, 1998, Judge Ralph R. Beistline held an "Annual Review" hearing. The division filed an "Annual Review of Children in Need of Aid Report," which included its permanency plan to terminate N.A.'s parental rights and free the children for adoption. On November 18 the superior court issued its decision to continue state custody.

In the following six months, the division started to implement its permanency plan. The division filed a petition to terminate N.A.'s parental rights to her sons. The division prepared a case plan for N.A. This plan generally continued the previous plan activities but added a new task of encouraging N.A. to consider relinquishing parental rights to all four of her children by Smith. N.A. later relinquished her parental rights to the boys.

The division also filed a termination petition for N.A.'s daughters. The termination trial was scheduled to start on September 13, 1999. In August, N.A.'s counsel moved to continue the trial because he was recovering from major surgery. The superior court granted the motion and rescheduled trial to November 22.

During the months before trial, N.A. admitted to her social worker that she had been beaten and raped during a drinking incident. As recently as three weeks before the termination trial, N.A. admitted to another drinking episode.

A week before trial was scheduled to begin, N.A. filed a motion asking for a permanency hearing and a continuance of the termination trial. The superior court denied the motion. Trial began on November 17. On January 21, 2000, the trial court issued its ruling to terminate N.A.'s parental rights to her daughters.

## III. STANDARD OF REVIEW

Whether the state has complied with the "active efforts" requirement of the

Indian Child Welfare Act (ICWA)[4] presents a mixed question of law and fact.[5] Whether N.A.'s due process rights have been violated is a question of law.[6] We defer to the trial court's factual findings unless clearly erroneous and review *de novo* any questions of law.[7]

## IV. DISCUSSION

N.A. argues two points in this appeal. She contends that the superior court (1) violated her due process rights by failing to hold a permanency hearing; and (2) erred in concluding that the state made active efforts to provide programs and services to reunite N.A. with her children.

**4.** *See* 25 U.S.C. §§ 1901–23 (2000).

**5.** *See A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 259 (Alaska 1999) (citing *A.M. v. State (A.M.II)*, 945 P.2d 296, 304 n. 10 (Alaska 1997)).

**6.** *See D.M. v. State, Div. of Family of Youth Servs.*, 995 P.2d 205, 207 (Alaska 2000).

**7.** *See id.; see also A.H. v. State, Dep't of Health & Social Servs.*, 10 P.3d 1156, 1160 (Alaska 2000).

**8.** AS 47.10.080(*l*) sets out the requirements for permanency and annual review hearings:

Within 12 months after the date a child enters foster care as calculated under AS 47.10.088(f), the court shall hold a permanency hearing. The hearing and permanent plan developed in the hearing are governed by the following provisions:

. . . .

(5) the court shall hold a hearing to review the permanent plan at least annually until successful implementation of the plan; if the plan approved by the court changes after the hearing, the department shall promptly apply to the court for another permanency hearing, and the court shall conduct the hearing within 30 days after application by the department.

**9.** *See* AS 47.10.080(*l*).

**10.** CINA Rule 17.2 requires the division to file a report and the court to make findings:

(c) Report. The Department shall file and serve a permanency report no later than ten days prior to the permanency hearing. In the report, the Department shall specify its proposed permanent plan for the child with a detailed statement of the facts and circumstances supporting the proposed permanent plan.

. . . .

## A. The Superior Court Did Not Violate Due Process.

■ N.A. argues that the superior court's failure "to conduct a permanency plan hearing as required by AS 47.10.080(*l*)" violated her right to due process. The state argues that the annual review report, the October 5, 1998 hearing, and the superior court's findings fulfilled the statutory requirements for a permanency plan hearing.

■ Alaska Statute 47.10.080(*l*)[8] provides that the court shall hold a permanency plan hearing within twelve months after the date a child enters foster care and hold review hearings at least annually.[9] Under the Alaska Child in Need of Aid Rules, permanency hearings require a state-generated report and specific judicial findings.[10]

(e) Findings. The court shall make written findings, including findings related to

(1) whether the child continues to be a child in need of aid;

(2) whether the child should be returned to the parent or guardian, and when;

(3) whether the child should be placed for adoption or legal guardianship and whether the Department is in compliance with AS 47.10.088(d) relating to the filing of a petition for termination of parental rights;

(4) whether the child should be placed in another planned, permanent living arrangement and what steps are necessary to achieve the new arrangement; and

(5) in the case of a child who has attained age 16, the services needed to assist the child to make the transition from foster care to independent living or adult protective services.

If the court is unable to make a finding required under this paragraph, the court shall schedule and hold another permanency hearing within a reasonable period of time as defined in AS 47.10.990(23).

(f) Additional Findings. In addition to the findings required under paragraph (e), the court shall also make written findings related to

(1) whether the Department has made reasonable efforts required under AS 47.10.086 or, in the case of an Indian child, whether the Department has made active efforts to provide remedial services and rehabilitative programs as required by 25 U.S.C. Sec.1912(d);

(2) whether the parent or guardian has made substantial progress to remedy the parent's or guardian's conduct or conditions in the home that made the child a child in need of aid; and

(3) if the permanent plan is for the child to remain in out-of-home care, whether the child's out-of-home placement continues to be appropriate and in the best interests of the child.

. . . .

(i) Subsequent Review. The court shall hold a hearing to review the permanent plan at least

*1. The superior court fulfilled the requirements of a permanency hearing.*

A permanency hearing must be held: (1) within twelve months after the date the child entered foster care as calculated under AS 47.10.088(f); (2) within thirty days after the court determines pursuant to CINA Rule 17.1 that reasonable efforts are not required; or (3) upon application by a party, when good cause is shown.[11] According to AS 47.10.088(f), a child is considered to have entered foster care on the earlier of the date of a judicial finding of abuse or neglect or sixty days after the date of removal from the child's home.[12]

■ N.A.'s daughters entered state custody on November 3, 1997. On that occasion, N.A.'s daughters were taken into state custody to allow N.A. to enter a residential substance abuse treatment program. There was no judicial finding of neglect or abuse. Thus, the date on which the girls entered foster care is January 2, 1998, sixty days after removal from N.A.'s home. Accordingly, AS 47.10.080(l) required that a permanency hearing be held before January 2, 1999.

What the court and the division have named the annual review of 1998 fulfills the requirements of a permanency hearing. The court held a hearing on October 5, 1998, within twelve months of the girls' entry into foster care. As required by CINA Rule 17.2(c) and (e), the division filed a report including a proposed permanent plan of terminating parental rights and supporting facts, and the court made appropriate findings. Thus, the superior court fulfilled the requirements of a permanency hearing.

*2. The superior court did not err by failing to hold a review within one year of the permanency hearing.*

Although her argument is unclear, N.A. may be basing her due process claim on the superior court's failure to hold an annual review before the termination hearing. Alaska Statute 47.10.080(l)(5) requires that the superior court hold a review at least annually after the permanency hearing. The equivalent of a permanency hearing was held on October 5, 1998. There is no record of an annual review on or before October 5, 1999.

■ A failure to timely hold an annual review is normally error. In this case, however, the court originally scheduled the termination hearing for September, before the statute required an annual review. N.A.'s counsel requested the continuance that resulted in delaying the termination hearing to a date more than twelve months from the permanency hearing. Thus, by delaying the termination trial, N.A. in effect artificially manufactured the need for an annual review. Under these circumstances, the superior court did not err in failing to hold an annual review before the termination trial.

**B. The Superior Court Did Not Err in Concluding that the State Made Active Efforts to Reunite N.A. with Her Children.**

■■ One requirement of terminating parental rights under ICWA is proof by a preponderance of the evidence that the state has made active, but unsuccessful, efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family.[13] Active efforts occur "where the state caseworker takes the client through the steps of the plan rather than requiring that

annually until successful implementation of the plan.

**11.** *See* CINA Rule 17.2(a); AS 47.10.080(l). Parts (2) and (3) do not apply here. On appeal, N.A. relies only on Part (1) to support her position that she was entitled to a permanency hearing.

**12.** AS 47.10.088(f) indicates how to determine the date that a child entered foster care:

A child is considered to have entered foster care under this chapter on the earlier of

(1) the date of the first judicial finding of child abuse or neglect; or

(2) 60 days after the date of removal of the child from the child's home under this chapter.

**13.** *See* 25 U.S.C. § 1912(d) ("Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.").

the plan be performed on its own."[14] The determination of active efforts is done on a case-by-case basis.[15]

█ In this case, the state's efforts were more than active; they were exemplary. The division and the Department of Corrections worked together with the Tanana Chiefs Conference to provide numerous and varied types of assistance to N.A.[16] A partial list of recent efforts includes: placing N.A. at the TCC Paul Williams House; enrolling N.A. in three different substance abuse treatment programs (Fairbanks Rescue Mission, Women's and Children's Residential Program, Regional Center for Alcohol and Other Addictions); completing a psychiatric evaluation; providing psychiatric therapy (monthly visits scheduled with Dr. Gooding); encouraging attendance at Alcoholics Anonymous meetings (weekly attendance scheduled); enrolling N.A. in parenting classes; allowing weekly visitation with her children; arranging transportation for the visits; and taking temporary custody of the children so that N.A. could receive medical care.

Efforts before 1997 have included: enrolling N.A. in substance abuse treatment and aftercare (Nugen's Ranch, Dena A Coy, Regional Center for Alcohol and Other Addictions); providing parenting classes (including TEACH to instruct on caring for her boys); providing anger management classes (Alternatives to Violence); facilitating visitation with her children; referring N.A. to Developmental Disability, Vocational Rehabilitation; completing a neurological evaluation; arranging daycare for her children; giving parent aid through Resource Center for Parents and Children; and providing counseling for both N.A. and Smith.

█ N.A. now argues that the state has not provided a sufficient dual-treatment program to deal with both her addiction and mental health problems, pointing to treatment programs available in Anchorage that have not been attempted. However, her argument conflicts with the facts in two ways. First, N.A. was placed in the Fairbanks Rescue Mission program, which had experience working with dual-diagnosed patients and had sufficient resources to accommodate N.A. at her own pace. That effort failed when N.A. decided to leave the program before completion. Second, when the Anchorage programs were first considered, N.A. had expressed reluctance to leave the Fairbanks area for treatment. There was no failure by the state in regard to dual-treatment programs.

█ N.A. also notes that the division did not develop a case plan for her after she relinquished parental rights to her sons on April 26, 1999. She appears to argue that this change in circumstances required the state to make additional efforts. However, the boys had been in foster care since April 25, 1997; N.A.'s failed attempts at rehabilitation and her eventual relapses occurred without the extra burden of caring for them. N.A. knew that the state had previously attempted to terminate her parental rights and would likely do so again if she failed to complete a rehabilitation program. There is no objective reason to think that trying another residential dual-treatment program at that time would have had a successful outcome.

This court has held that a parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts.[17] Other courts have expressly held that where efforts have been made to address a substance abuse problem, the parent has shown no desire to change, and parental rights were terminated with respect to one child, ICWA allows the superior court to consider all of the efforts made by the state to avoid the

14. *A.A.*, 982 P.2d at 261 (quoting Craig J. Dorsay, *The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual* 157–58 (1984)).

15. *See id.*

16. In determining whether the state took active efforts, the Department of Correction's efforts are added to the division's efforts. *See A.M. II,*

945 P.2d at 305 ("It is of no particular consequence that the Department of Corrections (DOC), rather than DFYS, made these active remedial efforts.").

17. *See A.M. II,* 945 P.2d at 306; *see also A.A.,* 982 P.2d at 262–63.

breakup of the family in assessing whether those efforts were reasonable.[18] We conclude that the state made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family and thereby avoid the termination of N.A.'s parental rights.

## V.  CONCLUSION

Because the superior court met the statutory requirement that a permanency hearing be held within one year after the children entered state custody and correctly determined that the state made active efforts to provide remedial services and rehabilitative programs designed to prevent the termination of N.A.'s parental rights, we AFFIRM.

---

**18.**  *See Letitia V. v. Superior Court,* 81 Cal.App.4th 1009, 97 Cal.Rptr.2d 303, 308–09 (2000); *People* *in Interest of A.R.P.,* 519 N.W.2d 56, 60 (S.D. 1994).