**E. A., Appellant,**

v.

**STATE of Alaska, DIVISION OF FAMILY AND YOUTH SERVICES, Appellee.**

No. S–10200.

Supreme Court of Alaska.

May 10, 2002.

**988**

Kathleen A. Murphy, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

A mother appeals the termination of her parental rights to her Native child. We affirm the trial court's holding that the state made active, unsuccessful efforts to prevent this termination. Although the state failed to obtain an updated psychological evaluation of the mother following her child's allegation that she had abused him, an update would not likely have increased the mother's chances for reunification given her inability to maintain long-term sobriety and her resistance to receiving treatment. We also hold that substantial evidence supports the superior court's finding that returning the child to his mother's custody would likely result in serious emotional harm. Two experts testified that the child feared his mother and would regress if returned to her. Further, the record clearly demonstrated that the mother had not successfully overcome her substance abuse, and could not address her parenting issues until she had done so. We therefore affirm the superior court's termination decision.

## II. FACTS AND PROCEEDINGS

This appeal arises from the termination of E.A.'s parental rights to H.O., her six-year-old son.[1] H.O. is an Indian child within the meaning of the Indian Child Welfare Act.[2]

E.A. has led a troubled life. She claims to have been physically abused by her adoptive parents' children and sexually abused by a relative during her childhood, and she has a long history of substance abuse.

The Division of Family and Youth Services (DFYS) assumed custody of E.A.'s first child shortly after birth due to his parents' substance abuse and domestic violence problems. E.A.'s second child was born while she was in treatment at the Dena–A–Coy residential

---

1. E.A. is the biological mother of five children: three girls and two boys. E.A. relinquished her parental rights to the eldest three children as well as her youngest.

2. 25 U.S.C. §§ 1901–23, 1951 (1988).

substance abuse treatment center, and her third was born a year after she completed the treatment program. DFYS permanently removed all three children in 1994 due to their parents' substantial neglect and a dangerous home environment.

DFYS arranged for Dr. Michael Rose to conduct a psychological evaluation of E.A. Dr. Rose found that E.A. had a high potential for child abuse because of her negative attitudes towards her children, untreated anger issues, and authoritarian parenting style. He further found that E.A. was significantly addiction-prone, and especially likely to abuse substances when acutely stressed. Dr. Rose concluded that E.A. was "not currently capable of being a safe and nurtur[ing] caregiver to her children," that her "prognosis [was] very poor," and that her prospects for future treatment were "dismal at best."

E.A. entered Dena–A–Coy for the second time in March 1995. When H.O. was born later that year, the state filed a non-emergency CINA petition, but there was no removal at the time.[3] In 1996, pursuant to his parents' stipulation, H.O. was adjudicated a child in need of aid due to his parents' continuing substance abuse and domestic violence problems.

DFYS removed H.O. from E.A.'s custody in 1998 due to E.A.'s "poor parenting skills, refusal to accept services, and use of inappropriate care providers." E.A. was placed in the same foster home as his three older siblings.

In October 1999 H.O. claimed that his mother harmed him during a visit and that he was afraid of her.[4] DFYS suspended visitations and placed H.O. in therapy with Dr. Michael Baldwin. Dr. Jeanne Bereiter performed a psychological evaluation of H.O.

and concluded that he suffered from post-traumatic stress disorder. Over the next six months three psychologists (Dr. Baldwin, Dr. Bereiter, and Dr. Susan LaGrande) all cautioned that renewed visitation might result in further emotional harm.

DFYS filed a petition to terminate E.A.'s parental rights to H.O. in August 2000. The parties significantly narrowed the issues for trial by stipulating to most relevant facts. The only issues in dispute were whether DFYS had provided active remedial efforts directed towards reunifying E.A. and H.O. and whether the state could prove beyond a reasonable doubt that returning H.O. to his mother would likely cause him serious emotional harm. The court found in favor of the state on both issues.

E.A. appeals.

## III. DISCUSSION

### A. Standard of Review

■ Whether DFYS complied with the "active efforts" requirement of the Indian Child Welfare Act (ICWA) is a mixed question of fact and law.[5] Likewise, whether substantial evidence supports the court's conclusion that an Indian child is likely to be seriously harmed if returned to his parent is a mixed question of fact and law.[6] Whether expert testimony satisfies ICWA requirements is a pure legal question.[7] We review the court's factual findings under the clearly erroneous standard,[8] and its legal conclusions de novo.[9]

### B. The Trial Court Correctly Concluded that DFYS Made Active Efforts To Prevent the Breakup of E.A.'s Family.

■ Prior to terminating parental rights to a Native child, the state must prove by a

---

3. In 1996 E.A. successfully completed treatment at Dena–A–Coy and transitioned to New Dawn, an aftercare residential substance abuse treatment program.

4. H.O. later told a state psychologist that "[E.A.] was mean a long time, she slapped me with [a book]."

5. *N.A. v. State, Div. of Family & Youth Servs.,* 19 P.3d 597, 600–01 (Alaska 2001) (citations omitted).

6. *L.G. v. State, Dep't of Health & Soc. Servs.,* 14 P.3d 946, 949–50 (Alaska 2000) (holding that factual findings in termination proceedings are reviewed under clearly erroneous standard, but whether those findings comport with ICWA requirements presents questions of law).

7. *C.J. v. State, Dep't of Health & Soc. Servs.,* 18 P.3d 1214, 1217–18 (Alaska 2001).

8. *L.G.,* 14 P.3d at 949–50 (citation omitted).

9. *Id.* (citation omitted).

preponderance of the evidence that it made active, but unsuccessful, efforts to provide remedial services and rehabilitative. programs designed to prevent the breakup of the family.[10] The trial court held that active efforts had been made in this case, but without success. E.A. argues that DFYS's stipulated failure to make active remedial efforts for the first half of 1999 and its failure to obtain an updated psychological evaluation of E.A. after H.O.'s allegation of harm in October 1999 compel us to conclude that the state did not make active efforts.

The trial court found that an additional psychological evaluation of E.A. would have been of "marginal value" because two had already been conducted and another simply would have recommended services similar to those already being provided. This finding is not erroneous. Arguably, DFYS needed to conduct an updated evaluation to design an effective treatment program in light of abuse issues brought into focus by H.O.'s allegations in October 1999. Dr. LaGrande testified that an updated evaluation might be helpful to "guide future treatment."

However, the state makes a compelling argument that even if an updated evaluation might have ideally guided future treatment, E.A.'s failure to address her substance abuse problems strongly indicates that E.A. was not sufficiently interested in or capable of taking advantage of such treatment. E.A. failed to curb her substance abuse by the time of trial; in fact, multiple alcohol-related encounters with the police in the year leading up to trial indicate that she had taken a significant turn for the worse. Dr. LaGrande testified that E.A. would have to maintain sobriety for at least a year before she could expect to successfully begin dealing with her parenting problems. She further testified that E.A. had been provided many opportunities to obtain therapy and substance abuse treatment and had failed to take advantage of them.[11]

Although the evaluation may well have provided new information, the utility of that information was conditioned on E.A.'s ability to overcome her serious substance abuse problems. The new evaluation's recommendations would surely have been consistent with those of the earlier evaluations regarding her need to maintain long-term sobriety, and the record does not support a finding that E.A. is likely to meet this critical requirement in the near future.

Further, DFYS's failure to make active efforts from January to July 1999 is insignificant in light of the extensive remedial efforts the state has provided throughout its involvement with E.A.'s children apart from this seven-month period. E.A. has participated in six substance abuse treatment programs, parenting education, anger management classes, relationship and self-esteem classes, couples therapy, twelve-step programs, family counseling, ACF home-based services, the ACF preschool program, and CITC home-based services and therapy. E.A. also has a history of either refusing services altogether or abandoning treatment plans prior to completion.

E.A. admits that DFYS resumed active efforts in the two months before the October 1999 incident. Although DFYS's efforts thereafter consisted largely of failed attempts to contact E.A. or obtain information from her rather than the provision of services, E.A.'s evasive, combative conduct rendered provision of services practically impossible.[12]

---

**10.** 25 U.S.C. § 1912(d) (2000) (stating that court may terminate parental rights only if it finds by preponderance of evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful"); CINA Rule 18(c)(2); *K.N. v. State*, 856 P.2d 468, 476 (Alaska 1993).

**11.** E.A.'s social worker testified similarly, further adding that even if E.A. were fully cooperative it would take at least two to three years of intensive treatment efforts before she would be ready to be reunited with H.O.

**12.** She repeatedly failed to apprize DFYS of her contact information and ultimately refused to give her new telephone number to DFYS, skipped her custody extension hearing, was verbally abusive toward her social worker, and failed to adhere to DFYS's instructions to obtain a substance abuse assessment, curb her substance abuse, or attend AA meetings.

■ We have consistently held that "[a] parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts."[13] Further, where efforts have been made to address a substance abuse problem, the parent has made no effort to change, and parental rights have already been terminated as to one or more children as a result, the superior court may consider the degree of the state's efforts to prevent the breakup of the entire family in assessing whether that effort was sufficient under ICWA.[14] DFYS has expended substantial efforts over the last decade to prevent the breakup of E.A.'s family, without success. There is no reason to think that either an additional psychological evaluation or an additional seven months of intervention would have prevented this result.[15] Accordingly, we affirm the trial court's conclusion that active efforts were made.

## C. The Trial Court Properly Concluded that H.O. Would Likely Be Harmed if Returned to E.A.'s Custody.

■ The state must further prove beyond a reasonable doubt that H.O. is likely to suffer serious emotional or physical damage if placed with E.A. prior to terminating her rights to him.[16] This proof must include qualified expert testimony based upon the particular facts and issues of the case.[17] We hold that qualified expert testimony in combination with substantial evidence in the record supported the court's determination that

H.O. would likely be harmed if returned to E.A.

■ Dr. Baldwin, H.O.'s therapist, testified at trial, as did Dr. LaGrande, a clinical psychologist who was asked by H.O.'s guardian ad litem to review the case. E.A. argues that both experts' testimony was insufficient under our decision in *C.J. v. State, Dep't of Health & Soc. Servs.*,[18] because neither expert evaluated or interviewed E.A., and because the information they relied on to render their opinions was outdated.[19] The state correctly responds, however, that the testimony nonetheless supports the court's conclusion because both experts had substantial contact with H.O.[20] In contrast, the expert in *C.J.* relied exclusively on the DFYS case file.[21]

Further, while the expert's testimony in *C.J.* amounted to "little more than generalizations about the harms resulting from a parent's absence,"[22] both experts here spoke to the specifics of H.O.'s aberrant behavior and its connection to his traumatic relationship with his mother. Dr. Baldwin testified that H.O. exhibited significant behavioral difficulties, including nightmares in which he was being harmed, aggression towards his siblings, and repetitive play reenacting harmful incidents. Dr. Baldwin further stated that H.O. became very agitated when his mother was mentioned, and expressed fear during therapy sessions that his mother was coming to get him. H.O. would "shut down"

---

13. *N.A.*, 19 P.3d at 603–04; *A.M. v. State, Div. of Family & Youth Servs.*, 891 P.2d 815, 827 (Alaska 1995), *overruled on other grounds by In re S.A.*, 912 P.2d 1235, 1241 (Alaska 1996); *K.N.*, 856 P.2d at 477.

14. *N.A.*, 19 P.3d at 603–04 (citations omitted).

15. *Id.* (stating that there is no reason to think DFYS's failure to enroll parent in yet another residential dual-treatment program would have resulted in more successful outcome); *see also K.N.*, 856 P.2d at 477 (noting that "[a]lthough ... DFYS might have done more, it is unlikely that further efforts by DFYS would have been effective in light of [the parent's] attitude").

16. 25 U.S.C. § 1912(f) (2000).

17. *Id.*; *C.J.*, 18 P.3d at 1218.

18. 18 P.3d 1214 (Alaska 2001).

19. E.A. further notes that Dr. LaGrande testified that she lacked sufficient knowledge to evaluate E.A.'s capacity as a parent. Similarly, Dr. Baldwin testified that he had not had sufficient contact with E.A. to evaluate her parenting abilities.

20. Dr. Baldwin conducted fifteen or sixteen therapy sessions with H.O. over the course of seven months. Dr. LaGrande relied upon several sources in preparing her report, including her observations of H.O. playing with his foster mother, interviews with Dr. Baldwin, H.O.'s social worker, his foster mother, and his preschool teacher, and her review of DFYS records.

21. 18 P.3d at 1218.

22. *Id.*

or become non-verbal when the subject of his dreams or his mother arose. Dr. Baldwin testified that H.O. was emotionally fragile as a result of his traumatic experiences. He concluded that any contact between H.O. and E.A. would very likely trigger a substantial regression, and therefore had a "high potential" to cause H.O. "serious emotional harm."

Dr. LaGrande testified that H.O. was a psychologically fragile child, and that he needed a high degree of stability and consistency in order to overcome his traumatic experiences and successfully reach his developmental milestones. She was concerned that E.A. would not provide the structured, consistent environment H.O. needed to maintain his psychological growth. She concluded that returning H.O. to an environment in which he would predictably experience fear would prevent him from gaining the sense of comfort and security necessary for healthy psychological growth.

■ The state argues that the one-year lag between the experts' formulation of their opinions and their trial testimony is immaterial where E.A. has provided no evidence (or even argument) contradicting the experts' assessments. In fact, it seems clear that both experts would have been even more concerned about reunification of H.O. with E.A. if they had known of recent events. In contrast, the parent in *C.J.* introduced unrebutted evidence that he was successfully parenting his older child and that he had taken steps to put himself in a position to parent his younger children.[23]

■ Finally, there is substantial evidence of E.A.'s instability and parental incapacity outside of the experts' testimony in this case. ICWA does not require that the experts' testimony provide the sole basis for the court's conclusion; ICWA simply requires that the testimony support that conclusion.[24] Accordingly, there is no basis for holding the experts' testimony insufficient.

■ E.A. further argues that the court improperly focused on her substance abuse

in concluding that H.O. would likely be seriously harmed if returned to her custody. To prove that E.A.'s custody of H.O. would likely cause him harm, the state must prove both that E.A.'s conduct is likely to harm H.O. and that E.A. is unlikely to change her conduct.[25] E.A. argues that the state never proved a connection between her substance abuse and her parenting capacity, and therefore the court had no basis for concluding that E.A.'s harmful conduct was likely to continue, even if it had sufficient grounds to believe that E.A.'s substance abuse would continue.

■ However, the record contains substantial evidence linking E.A.'s alcohol and drug abuse and her parenting abilities. H.O. and his three older siblings were adjudicated children in need of aid due in part to their parents' substance abuse. E.A.'s substance abuse has been a factor in multiple DFYS interventions throughout the 1990s, and has been the principal focus of E.A.'s long history of receiving professional help. Finally, as noted above,[26] Dr. LaGrande and E.A.'s social worker both testified that E.A. had to achieve lasting sobriety prior to addressing her parenting issues, and both were very skeptical that she would ever do so given her significant relapse history.

Thus, the record gives every indication that E.A.'s poor parenting skills are highly related to her substance abuse problems, and that E.A. is unlikely to achieve lasting sobriety. The extensive evidence of E.A.'s chronic, unaddressed substance abuse, taken together with the unequivocal opinions of the two experts and H.O.'s documented fear of returning to his mother, provide the requisite proof both that E.A.'s conduct would likely harm H.O. and that E.A. is unlikely to permanently change that conduct.

## IV.   CONCLUSION

For these reasons, the superior court's decision is AFFIRMED.

---

**23.** *Id.* at 1219.

**24.** 25 U.S.C. § 1912(f) (2000).

**25.** *L.G.,* 14 P.3d at 950 (citation omitted).

**26.** *See supra* Part III.B.