**THOMAS H., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.**

No. S–12847.

Supreme Court of Alaska.

May 16, 2008.

Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

James E. Cantor, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, CARPENETI,
and WINFREE, Justices.

*OPINION*

FABE, Chief Justice.

## I.  INTRODUCTION

Thomas H. appeals the superior court's decision to terminate his parental rights.  He argues that the superior court erred in finding (1) that he failed to remedy the conditions that placed his children at risk of harm within a reasonable time period; (2) that the Office of Children's Services (OCS) made active efforts to prevent the breakup of the family; and (3) that placing the children in his custody would likely result in serious harm to them.  Because the record supports the trial court's decision and the trial court acted within its discretion, we affirm its judgment.

## II.  FACTS AND PROCEEDINGS

### A.  Facts

Thomas H. and Ana J. have two daughters together, Amelie and Ariel.[1]  The children qualify as Indian children under 25 U.S.C.

---

**1.** We use pseudonyms for all family members to    protect their privacy.

§ 1903(4). The elder daughter, Amelie, tested positive for marijuana at birth in 2002. The younger daughter, Ariel, tested positive for cocaine at birth in September 2005. As a result of the instability in her life, Amelie has been diagnosed with post-traumatic stress disorder. By the time of trial, Ariel had lived in three different foster homes. Ana cut off contact with her attorney a year prior to trial, and the superior court issued an order terminating her parental rights on May 16, 2007.

By his own admission, Thomas has never served as his daughters' primary caregiver because he was "in and out of jail during the time the children were in OCS custody." Thomas had been arrested twelve times between November 22, 2001 and March 2, 2007, the date his trial commenced. Six of those arrests occurred after December 2004, when the children were placed into OCS custody.

Thomas has not visited with his older daughter Amelie since May 2006, when he reentered prison. Thomas sought to reinstate visitation with Amelie after his release but that request was denied upon the recommendation of Amelie's counselor. A superior court later upheld the decision to deny visitation privileges. Thomas maintained weekly supervised visits with his younger daughter Ariel beginning in January 2007. He cancelled four of the twenty-two scheduled one-hour visits.

From a young age, Thomas has struggled with substance abuse problems. At the time of his termination trial, Thomas had pending felony charges of drug possession and eluding a police officer. And before the trial's conclusion, Thomas entered a plea deal requiring him to serve a prison term of at least one year and twenty days. Thomas claims, however, that "his sobriety demonstrates success in remedying the underlying conduct that led to OCS's involvement with his children." Thomas reports that he has been sober since May 2006, notwithstanding his allegedly accidental use of opiates, which an October 2006 urinalysis detected.[2] During his future incarceration, Thomas has proposed that his new wife Sophia care for the children.

Currently, Amelie and Ariel are cared for by their maternal great aunt and uncle, Sean and Lisa J. Sean and Lisa J. have served in this capacity intermittently since September 2004, and they have been the primary caregivers for the girls without interruption since April 27, 2006. The couple, with the facilitation of OCS, plans to adopt the girls.

**B. Proceedings**

OCS involvement with Thomas's family began when Amelie tested positive for marijuana at birth. OCS created a safety plan on August 8, 2002, and Amelie returned home with Ana. OCS became involved in the case again on September 13, 2004, when Sean and Lisa J., who had been taking care of Amelie, filed for a temporary restraining order against Ana. OCS filed a report recommending that Amelie remain with her great aunt and uncle. OCS also created the first of multiple case plans for both Ana and Thomas, recommending treatment for substance abuse, parenting skills classes, and mental health therapy.

On September 6, 2005, the state removed Thomas and Ana's second child, Ariel, from their custody two days after she was born with cocaine in her system. The next day, OCS met with Ana and Thomas to discuss objectives for a case plan, which again included substance abuse treatment, parenting classes, and mental health assessments. Thomas initiated substance abuse treatment and parenting classes under the new case plan. After just one day of substance abuse treatment in October 2005, however, Thomas led police on a high-speed chase while high on ecstasy. Soon after his release from custody, he was again arrested for possession of ecstasy. Meanwhile, Ana entered the Family CARE Court,[3] which handled her treatment plans.

---

**2.** Thomas maintains that he slipped in the shower and afterwards his mother gave him two pills for pain that he thought were aspirin.

**3.** The Family CARE Court is a therapeutic court program for child in need of aid cases, designed to address the needs of parents with identified substance abuse problems. It combines intensive judicial supervision and monitoring with

OCS developed a final case plan for Thomas on November 20, 2006, requiring treatment for substance abuse, parenting classes, and mental health treatment. This time, Thomas largely complied with the substance abuse treatment and parenting class requirements, and although he did not meet his case plan's requirement that he undergo mental health treatment, OCS apparently failed to refer him to a facility that could conduct a mental health assessment. By the time of Thomas's ultimate case plan, however, OCS had shifted its permanency goals for Amelie and Ariel to adoption, with the concurrent goal of reunification.

OCS sought to terminate Thomas and Ana's parental rights at trial on March 2, 2007. Ana failed to appear and the remaining parties agreed to engage in a family group conference with the adoptive parents regarding visitation benchmarks for the children. When these talks proved unproductive, the termination trial recommenced on May 30, 2007.

At trial, OCS presented testimony from Kristi Fuller, a clinical neuropsychologist who had interviewed Thomas and diagnosed him as having antisocial personality disorder. The state also presented testimony from Thomas's OCS caseworker, Jennifer Hernandez. Thomas presented testimony from Jessica Burdick, the case manager for Cook Inlet Tribal Council's supervised visitation program, and from Anna Baughman, the outpatient clinician at Genesis House Recovery Center, where Thomas had been receiving treatment. Dr. Baughman testified that during six months of treatment, Thomas did not exhibit symptoms of antisocial personality disorder. Thomas and his new wife, Sophia, also testified as to their ability to take care of the girls.

Following oral argument on June 26, 2007, Superior Court Judge Stephanie E. Joannides presented her findings from the bench. The superior court did not find clear and convincing evidence to support Dr. Fuller's diagnosis of antisocial personality disorder. Nevertheless, the superior court terminated Thomas's parental rights, reasoning that his unavailability due to incarceration and his "insufficient track record" meant that placing the children with him "would be likely to . . . result in serious emotional or physical damage to the children."

The superior court reasoned that subsections (2) (incarceration) and (10) (substance abuse) of AS 47.10.011 supported the decision to terminate Thomas's parental rights.[4] With respect to the former, the superior court found that Thomas had been unable to "provide a stable home" for his daughters during his previous incarcerations.[5] The superior court also noted that Thomas's wife Sophia is "a new spouse," with whom the children have had little or, in Amelie's case, no contact, and thus "in light of their current placement and the court's evaluation for [their] best interest, I would not find that the suggestion for [Thomas's] present wife to be their custodian is an adequate arrangement for their care."

Under subsection (10) of AS 47.10.011, the superior court found by clear and convincing evidence that substance abuse has substantially impaired Thomas's ability to parent, and "that has placed his children at substantial risk of harm." The superior court again acknowledged that Thomas appeared to have succeeded in his latest substance abuse treatment but found that Thomas had delayed too long in becoming sober, and that "because of

---

treatment and the coordinated delivery of assessments and services.

4. AS 47.10.011 provides in part:
    Subject to AS 47.10.019, the court may find a child to be a child in need of aid if it finds by a preponderance of the evidence that the child has been subjected to any of the following:
    . . . .
    (2) a parent, guardian, or custodian is incarcerated, the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid

under this chapter, and the incarcerated parent has not made adequate arrangements for the child;
    . . . .
    (10) the parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child[.]

5. *See id.* at (2).

the circumstances that are interwoven in one of the other factors, it is impossible for him to really successfully complete all his treatment and prove that the treatment has been successfully completed." In other words, the superior court concluded, Thomas "hasn't really, truly been able to remedy the conduct because he is going to be unavailable and incarcerated."

The superior court went on to find beyond a reasonable doubt that placing the children with Thomas "would be likely to . . . result in serious emotional or physical damage to the children." Finally, the superior court turned its attention to OCS, and found that the agency had made active efforts to provide support services and treatment services to Thomas, "other than the mental health component." The superior court found that OCS's failure to make a referral for Thomas's mental health assessment was the "only component" lacking in the state's "active efforts," however, and that this shortcoming was not legally significant "in light of [his] status."

Thomas appeals.

## III. STANDARD OF REVIEW

■ We review a trial court's factual findings for clear error.[6] Findings are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party leaves us with a definite and firm conviction that a mistake has been made.[7] We review the trial court's application of the law to factual findings de novo.[8] Whether the state has complied with the active efforts requirement of the Indian Child Welfare Act[9] (ICWA) presents a mixed question of fact and law.[10]

## IV. DISCUSSION

Thomas argues that he has overcome his substance abuse problems and made ade-

quate arrangements for the children during his upcoming incarceration. Consequently, he maintains that the trial court erred in finding that he failed to remedy the conduct that placed the children at substantial risk of harm within a reasonable period of time. Thomas claims that OCS did not make the required active efforts to prevent the breakup of his family because it failed to properly refer him for the mental health assessment included in his case plan, hence depriving him of therapy that might have led to his earlier compliance with OCS case plan objectives. Finally, Thomas maintains that the superior court erred when it found that placing the children with him would likely result in substantial harm to them. We dispose of each of these arguments in turn.

**A. The Superior Court Did Not Err in Finding that Thomas Failed, Within a Reasonable Time, To Remedy the Conduct that Put Amelie and Ariel at Substantial Risk.**

■ Alaska Statute 47.10.088 provides for involuntary termination of parental rights where a child qualifies as a child in need of aid under AS 47.10.011 and the parent:

(A) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or

(B) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury[.] [11]

In answering the question whether the parent has remedied or will remedy within a reasonable time the conditions in the home that place the child at substantial risk, the court may consider any fact relating to the best interests of the child,[12] including:

**6.** *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004).

**7.** *Id.*

**8.** *Id.*

**9.** 25 U.S.C. §§ 1901–1963 (2008).

**10.** *Gilbert M. v. State*, 139 P.3d 581, 586 (Alaska 2006).

**11.** AS 47.10.088(a)(2)(A)-(B).

**12.** *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896 (Alaska 2003).

(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;

(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;

(3) the harm caused to the child;

(4) the likelihood that the harmful conduct will continue; and

(5) the history of conduct by or conditions created by the parent.[13]

The superior court found that Thomas's history of incarceration and substance abuse, as well as his pending incarceration, put the children in need of aid and that Thomas had failed, within a reasonable time, to remedy the conduct or conditions that placed Amelie and Ariel at substantial risk of physical or mental injury. Accordingly, the superior court terminated Thomas's parental rights.

As a preliminary matter, Thomas points out that the superior court's written order cites AS 47.10.011(10) (substance abuse of the parent) and AS 47.10.011(1) (abandonment) for its child in need of aid determination while the superior court's oral findings cite AS 47.10.011(10) and AS 47.10.011(2) (incarceration). Thomas theorizes that, because he "was not incarcerated at the time of termination and had not been incarcerated for over a year," the trial court erred or possibly "misspoke during its oral findings." He goes on to argue that the superior court erred in relying on subsection (1) of AS 47.10.011, because his conduct—including his successful completion of substance abuse treatment and parenting classes, his visitations with his younger daughter, and his efforts to visit with his older daughter—demonstrates "that he did not disregard his responsibilities towards his children." We need not consider, however, whether the abandonment prong of AS 47.10.011 applies to Thomas because the superior court clearly based its decision on Thomas's history of substance abuse and incarceration under AS 47.10.011(10) & (2).[14]

Thomas argues that, regardless of the legal grounds on which the superior court purported to base its ruling, "it is clear from the court's statements and the court's written order that it was Thomas's impending incarceration that ultimately led the court to its decision." That interpretation, however, does not withstand scrutiny. The superior court recognized that Thomas's pending incarceration would likely lead to continued instability for the children should they be placed in the custody of Thomas's new wife. But the court primarily relied on Thomas's pending incarceration to support its conclusion that Thomas's history of substance abuse and resulting incarceration remained all too recent.

Turning to AS 47.10.011(10), the superior court based its finding on Thomas's long struggle with substance abuse and his record in treatment, rather than any future incarceration. The superior court noted that in Thomas's most recent treatment, "[t]here were periods of time and concern over his compliance." Indeed, as recently as October 4, 2006, Thomas tested positive for opiates. And even accepting Thomas's assertion that he inadvertently consumed the opiates that caused him to fail the October 2006 test and has in fact "been sober since May 2006," as the superior court pointed out, "all of this has happened in a somewhat artificial setting, meaning that he's on third-party . . . his wife is with him every minute making sure he follows through, and there's the threat of jail and of an increased jail sentence." The superior court thus concluded that Thomas had "an insufficient track record," with only "sporadic and spotty" success in light of his substantial impairment "by the addictive or habitual use of an intoxicant." [15]

Time was a determinative factor in the superior court's finding. Although the trial court clearly believed that Thomas had made

13. AS 47.10.088(b).

14. OCS had sought to apply the abandonment provision, AS 47.10.011(1), to Ana, which may have led to a typographical error in the trial court's written order. The trial court's oral findings provide a much more thorough explanation of its analysis, however, and leave us with no doubt that it did not intend to rely on AS 47.10.011(1).

15. AS 47.10.011(10).

progress in his most recent treatment effort, it concluded that Thomas could not adequately demonstrate that he would remain sober:

> [Thomas] has struggled with substance abuse for some period of time. He has attempted to complete treatment and, to his credit, has completed treatment, but . . . aftercare really is the true indicator of success, and after he's off third-party, and because of the circumstances that are interwoven in one of the other factors, it is impossible for him to really successfully complete all his treatment and prove that the treatment has been successfully completed.

Indeed, the period of time during which Thomas appears to have succeeded at treatment corresponds exactly with his third-party supervision. In short, the record supports the trial court's conclusion that Thomas waited too long to begin to remedy his conduct.

This case presents a fact pattern similar to the one we considered in *Sherry R. v. State, Department of Health & Social Services, Division of Family & Youth Services.*[16] In *Sherry R.*, we upheld the termination of a mother's parental rights despite her success in completing substance abuse treatment prior to trial. Like Thomas, Sherry R. had a lengthy history of substance abuse and failed treatment experiences.[17] She also succeeded in staying sober for over a year prior to her termination proceeding.[18] Nevertheless, we held that "even though Sherry may have made strides towards remedying her conduct, the trial court could properly find that Sherry failed to address her substance abuse problem within a reasonable time."[19]

Thomas seeks to distinguish this case from *Sherry R.*, emphasizing our observation in *Sherry R.* that "even since sobriety, Sherry has continued to make choices that affect her children's lives adversely," including her continued relationship with a man "convicted of child sexual assault."[20] Thomas also argues that Sherry R. had a more prolonged "history of completing long-term treatment programs and relapsing," and therefore "this court should not consider *Sherry R.* as support for the state's argument that Thomas's successful treatment should be discounted due to his prior failures."

But Thomas has attempted to overcome his substance abuse problems with little success since the age of fourteen. Those problems have severely limited his capacity to act as a loving father to the children, if for no other reason than the consequence that he has been incarcerated during much of their lives.

Thomas has attempted and failed to complete numerous substance abuse treatment programs. In late 2004, after being charged with selling cocaine, Thomas was assessed by Genesis Recovery Services, where he refused to enter into the recommended long-term residential treatment. In January 2005 the Salvation Army Clitheroe Center provided a second assessment to Thomas, but he failed to return for treatment. Clitheroe staff succeeded in contacting Thomas and he briefly resumed treatment, but in June 2005 OCS reported in a predisposition report that Thomas was not participating in his urine analysis program and that he was unable to participate in a treatment program due to pending criminal charges. In October 2005 Thomas discontinued treatment at Clitheroe after just one day of treatment. He did so again in March 2006 after another single session at Clitheroe. Thomas finally began his most recent, successful treatment program at Genesis Recovery Services in November 2006, but only after the superior court denied him visitation with his elder daughter Amelie. As in *Sherry R.*, for Thomas "sobriety is a relatively new phenomenon in . . . life."[21]

Thomas's history of incarceration and pending incarceration further complicated his attempts to persuade the superior court that he has remedied his harmful conduct towards the children. Reviewing Thomas's history,

**16.** 74 P.3d at 902–03.

**17.** *Id.* at 898–900.

**18.** *Id.* at 899.

**19.** *Id.* at 902–03.

**20.** *Id.* at 903.

**21.** *Id.* at 902.

the superior court noted that he had been "arrested approximately 12 times since 2001," and that he had spent a significant amount of time in prison, including "most of 2003, a majority of '04, over six months, less time in '05, but ... for a significant period in 2006." The superior court observed that "because the children are very young," Thomas's frequent incarcerations put Amelie and Ariel "in a state of limbo for all of their lives."

The extent of Thomas's drug use and criminal behavior, from the very beginning of both of his daughters' lives, has created conditions that he cannot easily remedy. We have previously observed that "children under six years of age suffer tremendously when their bonding processes are interrupted," as evidenced by the legislative imperative "to provide for an expedited placement procedure to ensure that all children, especially those under the age of six years, who have been removed from their homes are placed in permanent homes expeditiously." [22] Thomas's pending incarceration at the time of trial frustrated the prospect for such an expeditious, permanent placement. More importantly for our analysis here, Thomas's pending incarceration belies his claim that he has remedied his conduct within a reasonable time. We therefore affirm the superior court's determination that he has failed to remedy his conduct within a reasonable time.

### B. The Superior Court Did Not Err in Finding that OCS Made Active Efforts To Prevent the Breakup of the Family.

■ Thomas argues that OCS cannot meet ICWA's requirement "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." [23] Thomas contends that OCS failed to meet even its obligation under AS 47.10.086 to "make timely, reasonable efforts to provide family support services to the child and to the parents," which are designed "to enable the safe return of the child to the family home, when appropriate." [24] Alaska law imposes a duty upon OCS to "identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid," and to "actively offer the parent or guardian, and refer the parent or guardian to, the services identified." [25] Thomas contends that while OCS identified the necessary services, it never made the requisite referrals for Thomas to obtain a mental health assessment. Thomas additionally alleges that OCS failed to provide services to him when Amelie and Ariel's mother, Ana, entered Family CARE Court.

Thomas cites *N.A. v. State, DFYS* [26] in support of his argument that OCS failed to make active efforts. In *N.A.,* we clarified that "[a]ctive efforts occur where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own." [27] But we rejected a parent's claim that the state failed to make "active efforts" because it did not provide her with an adequate mental health and substance abuse dual-treatment program. [28] And while unlike Thomas, the parent in *N.A.* received psychiatric treatment, we made a point of noting that "the state's efforts were more than active; they were exemplary." [29] OCS's failure here to provide a mental health referral to Thomas throughout the history of his case falls short of exemplary, but the agency nonetheless satisfied the "active efforts" requirement based upon its overall handling of the case. [30]

**22.** *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 79 P.3d 50, 56 (Alaska 2003) (quoting AS 47.05.065(5)).

**23.** 25 U.S.C. § 1912(d).

**24.** AS 47.10.086(a).

**25.** *Id.* at (a)(1)-(2).

**26.** 19 P.3d 597 (Alaska 2001).

**27.** *Id.* at 602–03 (internal citations omitted).

**28.** *Id.* at 604.

**29.** *Id.* at 603.

**30.** *See E.A. v. State, Div. of Family & Youth Servs.,* 46 P.3d 986 (Alaska 2002).

We find a more apt analogy to this case in *E.A. v. State, Division of Family & Youth Services,*[31] where we upheld a finding that OCS made active efforts even though it "failed to obtain an updated psychological evaluation of the mother following her child's allegation that she had abused him."[32] We reasoned that "an update would not likely have increased the mother's chances for reunification,"[33] and that the inaction was "insignificant in light of the extensive remedial efforts the state has provided throughout its involvement with E.A.'s children apart from this seven-month period."[34] Here, while the trial court acknowledged that OCS should have referred Thomas to a mental health provider following its November 20, 2006 case plan, the court also found that Thomas's own actions—in particular his frequent incarceration—would have frustrated the success of any OCS services. Furthermore, like E.A., Thomas received a number of referrals from the state for services, including multiple substance abuse treatment programs and parenting classes. In light of these services, we cannot accept the argument that the agency's failure to make a mental health referral imposed a roadblock on subsequent termination proceedings.

And we see no fault in the state's efforts aside from its failure to make the mental health referral. Thomas alleges that OCS's "lack of active efforts is further evidenced by the complete failure to provide services to Thomas when Ana J., the children's mother, entered Family [CARE] court." But as the state points out, Thomas received services during the time that the case was in CARE court. In sum, nothing in the record before us suggests that the superior court erred in finding that OCS made active efforts to provide remedial services to Thomas.

Finally, Thomas argues that even if active efforts were made, the superior court erred in finding that the efforts made were "unsuccessful" as required by ICWA. The analysis following in Part IV.C, coupled with our holding from Part IV.A that Thomas failed to remedy his conduct within a reasonable time, disposes of this argument.

**C. The Superior Court Did Not Err in Finding that the Return of the Children to Thomas's Custody Would Likely Result in Serious Emotional Damage to Amelie and Ariel.**

■ Thomas argues that the qualified expert testimony, in combination with substantial evidence in the record, failed to support the superior court's determination that Amelie and Ariel would likely be harmed if placed in Thomas's care. We disagree.

■ In order to terminate a parent's rights to an Indian child, the trial court must find, based on "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child."[35] In reviewing ICWA's legislative history, we have observed:

> [T]he primary reason for requiring qualified expert testimony in ICWA termination proceedings was to prevent courts from basing their decisions solely upon the testimony of social workers who possessed neither the specialized professional education nor the familiarity with Native culture necessary to distinguish between cultural variations in child-rearing practices and actual abuse or neglect.[36]

ICWA requires that expert testimony support a decision to terminate parental rights, "based upon the particular facts and issues of the case," but "ICWA does not require that the experts' testimony provide the sole basis for the court's conclusion."[37] Here, Dr. Fuller's expert testimony, coupled with the lay testimony and evidence on the record,

**31.** 46 P.3d 986.

**32.** *Id.* at 988.

**33.** *Id.*

**34.** *Id.* at 990.

**35.** 25 U.S.C. § 1912(f).

**36.** *L.G. v. State, Dep't of Health & Social Servs.,* 14 P.3d 946, 952–53 (Alaska 2000) (emphasis omitted).

**37.** *E.A.,* 46 P.3d at 991–92.

satisfies ICWA and adequately supports the trial court's decision.

Thomas argues that the trial court clearly erred when it determined, beyond a reasonable doubt, that returning the children to him was likely to result in serious emotional and physical damage to them. Thomas maintains that the superior court unreasonably relied on the testimony of Dr. Fuller. He further claims that the court exaggerated the harm that Thomas's future incarceration would cause the children, and minimized the qualifications of Sophia, Thomas's new wife, as a caretaker for the children. He asserts that Sophia would be particularly well suited to care for Ariel, whom Sophia had met during Thomas's visitations.

Thomas's arguments are unavailing. The superior court's oral findings demonstrate that it gave weight to the testimony of Dr. Baughman, who testified on behalf of Thomas and disputed Dr. Fuller's diagnosis of antisocial personality disorder. The court noted the discrepancy between the two experts and concluded that it could not "find by clear and convincing evidence that you do have an antisocial personality disorder. There's enough other information to suggest that you are able to make positive steps in your life." Nevertheless, the superior court made clear that it had relied on Dr. Fuller's testimony to reach its conclusion, noting that Dr. Fuller's report "does provide me clear and convincing evidence ... at a minimum that the risk of returning the children home is great." The trial court further explained:

> I did consider the evidence under the proof-beyond-a-reasonable-doubt standard and did consider the testimony of the experts that if the children were returned, that it would be likely to ... result in serious emotional or physical damage to the children because of [Thomas's] unavailability, the continued issues that at least [Amelie] has faced with respect to an ability to visit with him. . . . And also the concern is over his substance abuse and unavailability and the impact those factors would have on the children.

The evidence at trial supports the reasoning that led the superior court to its judgment.

As the superior court noted in its written findings, "Dr. Fuller's evaluation indicated that [Thomas] exhibited a persistent pattern of negative behavior," and that Thomas's "high likelihood of repeated incarceration within the next couple of years" threatened to "damage any bond formed with the children while he was out of custody." The court emphasized Dr. Fuller's opinion that Thomas "is not a candidate to be a custodial parent, and that he is unlikely to be able to meet the children's needs for security and safety over the long term."

Dr. Fuller's own testimony, based on her knowledge of the family and tests performed by Thomas, sheds light on her assessment:

> The harm that I do see is ... I imagine his children, given contact with him, would adore that time ... and ... it could disrupt their ability to form attachments later when you're having a visitation that's fun and games. But particularly with an adult who is good with children and then you're having to go back into a living environment where you might be at a phase where limits are being set ... that can cause problems with children. And I guess it could cause short-term problems from the standpoint of their ability to function ... in an adoptive home.

Dr. Fuller also traced the connection between Thomas's prior conduct and his likely inability to conform his conduct over the long term to appropriately parent his daughters. She noted the "chronicity of [Thomas's] past behavior," and the fact that Thomas had only begun his reforms at the "last-possible-minute," after the children had already spent years in OCS custody.

As the superior court noted, other evidence supports Dr. Fuller's prediction that failure to terminate Thomas's parental rights would pose an unacceptable risk to his daughters. A mental health assessment of Amelie in October 2006 similarly concluded that Thomas represented an undesirable presence in his daughter's life:

> In terms of visitation with the father, the multi-volume case file shows that he has been given many opportunities to fulfill the role of father and surfacing again now to enter the life of his children, as if it were

another fresh start for him, just creates the specter that the child will again respond with hope. She will likely think her dad will be able to sustain an interest in her and become a real father. If her hopes are proven again to be misplaced—as they have many times in the past—the eventual result is damage to the child's capacity for attachment.

The social worker went on to express concern that Thomas "seems intent on pressing his place as father—inserting himself emotionally between [Amelie] and her uncle," potentially leading Amelie to "feel wrong" and not "to accept her potential adoptive parents as her 'real' family." Superior Court Judge Mark Rindner later upheld the decision to deny Thomas's visitation privileges with Amelie.

Like Amelie, Ariel has spent her life in the care of people other than her father. Thomas has maintained contact with Ariel, attending eighteen of twenty-two scheduled weekly visitations, but he admitted that because the visits were only an hour long, he never tried to exercise the skills that were taught in his parenting classes. We have held that a trial court must find "both proof that the parent's conduct is likely to harm the children, and proof that it is unlikely that the parent will change [his] conduct,"[38] in order to terminate parental rights under 25 U.S.C. § 1912(f). The trial court made findings on both counts, and the testimony of expert and lay witnesses provides sufficient evidence to support those findings.

## V. CONCLUSION

Thomas's long history of substance abuse and frequent incarceration has placed Amelie and Ariel in need of aid. Although OCS made active efforts to prevent the breakup of Thomas's family, he did not take advantage of those efforts until it was too late, when granting him custody over the children posed an unacceptable risk of harm. Accordingly, we AFFIRM the decision of the superior court.

---

**38.** *L.G.,* 14 P.3d at 950.