**SANDY B., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.**

**Leo W., Appellant,**

v.

**State of Alaska, Department of Health & Social Services, Office of Children's Services, Appellee.**

**Nos. S–13302, S–13310.**

Supreme Court of Alaska.

Sept. 25, 2009.

---

Angela Greene, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

Sandy B. Brooke Browning, Lewis & Thomas, P.C., Nome, for Appellant Leo W. Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Richard A. Svobodny, Acting Attorney General, Juneau, for Appellee.

Before: CARPENETI, Chief Justice, EASTAUGH, FABE, WINFREE, and CHRISTEN, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

The Office of Children's Services (OCS) removed three girls, who are Indian children under the Indian Child Welfare Act, from the care of their parents in three separate alcohol-related incidents between September 2005 and December 2007. The parents began to participate in residential substance abuse treatment just three weeks before the trial to terminate their parental rights. Before entering residential treatment, the parents had repeatedly denied that they had problems with alcohol, declined to communicate with OCS, failed to provide OCS with current contact information, and expressed interest in relinquishing their parental rights to the two oldest girls. Following a three-day termination trial, the trial court issued two written orders terminating their parental rights to all three children. The parents appeal the trial court's findings concerning the adequacy of OCS's active efforts to reunify them with their children and the sufficiency of the expert testimony. Given OCS's efforts throughout its involvement with the family and the parents' lack of cooperation and failure to acknowledge their problems with alcohol, the trial court's active efforts finding was not erroneous. The trial court also did not err in giving weight to the testimony of OCS's expert because the testimony was sufficiently grounded in the case's facts and issues and was consistent with the other evidence presented at trial. We therefore affirm the trial court's termination of the parents' rights to the three children.

## II. FACTS AND PROCEEDINGS

### A. Facts

Sandy is the mother of three girls, Vicki, Kathy, and Sarah.[1] Leo is the father of Vicki, born in 2001, and Sarah, born in 2007. Kathy was born in 2004 and her father, Trevor, is deceased. The three girls are Indian children under the Indian Child Welfare Act (ICWA).[2]

The children were removed from their parents' custody at different times. On September 8, 2005, OCS filed an emergency petition for adjudication of Kathy as in need of aid and for temporary custody. The petition alleged that during the early morning of September 7 Sandy became intoxicated in the presence of Kathy and then left Kathy in her apartment in Kotzebue with Kathy's father, Trevor, who was also intoxicated. According to the petition, Trevor later left the sixteen-month-old girl alone in the apartment and committed suicide.

Sandy was admitted to the Maniilaq Health Center in Kotzebue on September 8, 2005, due to suicidal ideation, and she remained in the hospital for about a week. Between September and December 2005, Sandy participated in residential drug and alcohol treatment at the Maniilaq Recovery Center, but she left twice against treatment advice. During substance abuse and mental health assessments at the center, Sandy disclosed her extensive history of depression and alcohol and marijuana use.

While Sandy was in residential treatment, she routinely attended OCS-scheduled visits with Kathy three times a week. But Sandy rarely visited Kathy after she left the treatment program. In addition to scheduling supervised visits between Sandy and Kathy, OCS enrolled them in the Early Learning Family program, which included monthly visits with a program worker as well as monthly play groups for parents and their children.

OCS alleged in a September 2006 request and report for permanency findings that it had "attempted to get [Sandy] to commit to a regular visitation schedule and was willing to provide transportation" and that "[o]n several occasions [she] agreed to times for visitation, home visits or office visits and then was either not home or didn't arrive at the office at the prearranged time."

At the termination trial, Sandy testified that she met regularly with OCS during the winter of 2006 to talk about her desire to have Kathy adopted but that she was told to wait. In February 2006 OCS received two reports of Sandy and Leo being "passed out drunk" and leaving their four-year-old daughter Vicki without a sober care provider. In March OCS received a report that the police had stopped Leo for intoxication and that Leo had failed to pick up Vicki from the babysitters. At the time, Sandy was incarcerated after having been arrested for criminal trespass when she refused to leave a residence while intoxicated. In April OCS helped Sandy apply for an inpatient program in Fairbanks but she declined to enter the program when a bed became available in June. That spring Sandy and Leo were living in various places in Kotzebue and Fairbanks because they did not have a permanent residence due to their frequent drinking.

On the morning of June 15, 2006, Vicki's babysitter tried to return Vicki to her parents but they were intoxicated and fighting. Vicki's babysitter called the Kotzebue police and said that she could not continue to care for Vicki or identify other suitable care providers. Vicki received a mental status evaluation after OCS took custody of her. According to the evaluation, Vicki told an OCS supervisor that Leo had offered her alcohol but she declined to drink it because she did not like the taste. The evaluation also reported that Vicki recalled watching her father push her mother to the floor and threat-

---

1. We adopt the pseudonyms used by the parties to protect the family members' privacy.

2. 25 U.S.C. §§ 1901–1963 (2006). Although the parties agree that the girls are Indian children under ICWA, it does not appear that the children's tribal affiliation has been fully resolved.

en to kill her. On June 16 OCS filed an emergency petition for adjudication of Vicki as in need of aid and for temporary custody. The petition noted that Vicki was "clearly affected by the incident[,] making remarks such as[,] 'did you see what my daddy did [to] my mommy?'"

On August 9, 2006, Sandy entered a treatment program in Fairbanks, but she left on September 1. OCS subsequently lost track of Sandy and Leo, apparently because OCS was unable to reach them using the phone numbers that Sandy and Leo had provided. According to a December 18, 2006 OCS report, Sandy and Leo spent most of the fall of 2006 in Fairbanks, living with relatives or in a homeless shelter, and each had problems with the law that involved alcohol.

After OCS discovered that Sandy was in the Kotzebue jail in late February 2007, it resumed communication with her and Leo, though OCS continued to have difficulty reaching them by phone. OCS also used radio announcements to try to contact Sandy and Leo during 2006 and 2007, but OCS stopped trying to reach Leo through the radio after he asked that an announcement be taken off the radio in late May 2007. OCS also sent the parents letters, some of which were returned.

In February 2007 OCS arranged seven supervised visits between the children and their parents, but Sandy and Leo failed to make most of the visits even though OCS had on some occasions been able to reach them by phone to remind them of the visits. The parents' absence may have been due to their expressed desire to relinquish their parental rights. After the parents missed several visits, OCS cancelled the rest because, as their case worker explained, "it's pretty traumatic for the kids to continually show up for a visit and wait for their parents to come and have nobody come." In the spring of 2007, OCS scheduled two substance abuse assessment appointments for Leo after he mentioned difficulty in arranging them himself, but he failed to attend both. A June 2007 permanency report for Vicki, which was incorporated into a superior court order, summarized Sandy's three unsuccessful attempts at completing substance abuse treatment while Vicki was in OCS's custody and observed that Leo had been "offered services to address substance abuse, [but] throughout the case he has adamantly stated he does not have a substance abuse problem." According to the report, the parents had not maintained contact with Vicki or participated in their case plans.

In the summer of 2007, Sandy and Leo expressed to their case worker that they were not interested in treatment, that "they had given up on the older two children," and that they had focused their efforts on retaining their youngest daughter, Sarah, who was born in August 2007. Within ten days of Sarah's birth, OCS received a number of reports concerning Sandy and Leo. On August 6 Leo was arrested for disorderly conduct after he was screaming at Sandy in the middle of the road at 2:30 a.m. On August 14 a Kotzebue police officer reported that four days before Sandy gave birth he had an interaction with her and she was intoxicated. The same police officer found Sandy passed out in the road on August 14. Sandy was admitted to the hospital for detox but she refused services. During a home visit after these reports were made, Sandy declined to talk with the family's case worker. Leo told the case worker that while Sandy was hospitalized, he was caring for Sarah. The case worker testified that Leo did not appear "interested in ... talking about anything to alleviate the concerns" of OCS and that the parents "weren't interested in engaging in services. They felt they didn't have a problem."

On October 9, 2007, OCS filed a petition for adjudication of Sarah as in need of aid and for temporary custody, but OCS did not remove Sarah from her parents' custody. The family's case worker again visited the parents at their home, but this time Leo declined to talk to the case worker, and Sandy said that she was not drinking and did not have a substance abuse problem. In November the parents' case worker had

some conversations with them over the phone and visited their home, but they did not make any treatment progress and Leo did not appear to be more receptive to OCS's efforts.

On December 4, 2007, Sandy and Leo had arranged for a babysitter to care for four-month-old Sarah while they were at a party, but unbeknownst to them, the babysitter dropped Sarah off at the party while they were both intoxicated. The parents discovered that their daughter was at the party when the police arrived, and they arranged for a family member to take her to a home shared by some of Sandy's relatives. OCS was concerned because there was a history of sexual abuse in that home. Sarah was removed from her parents' custody on December 5. On December 12 OCS filed a petition to terminate the parental rights of Sandy and Leo to all of their children.

In late December 2007 Leo received his first substance abuse assessment. During the assessment, Leo denied experiencing alcohol problems in the thirty days prior to the assessment and reported that he used alcohol fewer than eight times per month. OCS was given a copy of the assessment but did not have an opportunity to provide the assessor with additional information. The assessment "rate[d] [Leo's] potential for continued substance use as Low" and recommended that Leo participate in outpatient treatment. In January 2008 Leo went to jail after pleading guilty to driving under the influence, and he was then reassessed. Leo requested inpatient treatment, but both assessments recommended outpatient treatment.

In February 2008 Leo began participating in outpatient treatment. On March 14, about three weeks before the trial to terminate Sandy's and Leo's parental rights began, the parents entered inpatient treatment at the "Spud Farm," which is a recovery program outside of Kotzebue that emphasizes subsistence living.[3] At the termination trial, Sandy

testified that she was trying to control her alcohol problem. But Leo denied that he was dependent on alcohol and that he had ever placed his need for alcohol before the needs of his children.

## B. Proceedings

On September 8, 2005, OCS filed an emergency petition for adjudication of Kathy as in need of aid and for temporary placement. Following an adjudication hearing in early January 2006, Superior Court Judge Richard H. Erlich found that Kathy was in need of aid. On June 16, 2006, OCS filed an emergency petition for adjudication of Vicki as in need of aid and for temporary placement. The superior court found that Vicki was in need of aid after an adjudication hearing in late October 2006. The superior court also held a permanency hearing for Kathy in late October 2006. The superior court subsequently found that Kathy continued to be in need of aid and that the permanent plan for her was adoption. Following a permanency hearing for Vicki in mid-June 2007, the superior court found that Vicki continued to be in need of aid and that the permanent plan for her was adoption.

On October 9, 2007, OCS filed a petition for adjudication of Sarah as in need of aid and for temporary custody. OCS did not remove Sarah from her parents' custody. On November 9 the superior court issued a temporary supervision order that determined that Sarah was a child in need of aid but ordered that she remain in her parents' custody. On December 5 Sarah was removed from her parents' custody and the superior court issued a temporary custody order later that month.

On December 12, 2007, OCS filed petitions to terminate the parents' rights to all three children. The parties agreed to address the adjudication of Sarah as a child in need of aid and the termination of the parental rights to Vicki, Kathy, and Sarah in a single trial that

---

3. The Spud Farm, which is the colloquial name for the Maniilaq Association's Mavsigviq Program, is not a State-approved treatment facility.

was held during the spring of 2008. Dr. Raymond Droby testified as OCS's ICWA-required expert. At the conclusion of the trial, the superior court instructed the parties to address the factual issues in their closing arguments and "to write a legal brief on the issues in contention." Post-trial briefs were filed by Sandy, Leo, the children's guardian ad litem, and OCS.

The superior court issued two written orders terminating Sandy's and Leo's parental rights. The superior court's initial order on September 29, 2008, found that Sarah was a child in need of aid, "adopt[ed] the State's arguments as to all uncontested issues," and addressed the issues that were disputed by Sandy, Leo, or both of them.

The superior court issued a second written order terminating Sandy's and Leo's parental rights on October 21, 2008. In doing so, the superior court found by clear and convincing evidence that: the children were in need of aid; Sandy and Leo had not remedied the conduct or conditions that put their children at substantial risk of harm within a reasonable time; and OCS made active but unsuccessful efforts to provide services and programs designed to prevent the family's breakup. The superior court also found by a preponderance of the evidence that termination of Sandy's and Leo's parental rights was in the children's best interests. Finally, the superior court found that there was evidence beyond a reasonable doubt, including the testimony of a qualified expert pursuant to ICWA, that the children would likely suf-fer serious emotional and physical damage if returned to their parents.

Both parents appeal. Sandy challenges the superior court's finding concerning OCS's active efforts and the sufficiency of the expert testimony to support its finding that her children would likely suffer serious harm if they were returned to her care. Sandy also argues that she was denied due process by the cumulative effect of the alleged errors in the case. We granted Leo's unopposed motion to join Sandy's opening brief.[4]

## III. STANDARD OF REVIEW

■ We will affirm the trial court's factual findings in a child in need of aid (CINA) case unless they are clearly erroneous.[5] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below leaves us with a definite and firm conviction that a mistake has been made."[6] Whether OCS made active efforts as required by ICWA is a mixed question of law and fact.[7] Here, the parents argue that the trial court's active efforts finding failed to comport with ICWA's requirements. This is a question of law that we review de novo.[8] We will also review de novo the legal question whether an expert's testimony satisfies the standards of ICWA.[9] We will not review issues that were not raised below unless there is plain error, which exists where there is "a high likelihood that injustice has resulted" from an "obvious mistake" made below.[10]

## IV. DISCUSSION

The trial court must make five findings to terminate parental rights to an Indian child

---

4. Accordingly, the arguments made in Sandy's opening brief are referred to as Sandy and Leo's arguments. But because Leo did not file a motion to join Sandy's reply brief and Sandy clarified in this brief that her "arguments are distinct from any that may be advanced by the father should he choose to file a separate reply to the state's arguments," we refer to Sandy's arguments in her reply brief as her own.

5. *Audrey H. v. State, Office of Children's Servs.,* 188 P.3d 668, 672 (Alaska 2008).

6. *Id.* (internal quotation marks omitted).

7. *N.A. v. State, Div. of Family & Youth Servs.,* 19 P.3d 597, 600–01 (Alaska 2001).

8. *See Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 102 P.3d 932, 935 (Alaska 2004) ("Whether the superior court's findings comport with the requirements of ICWA or the CINA statutes and rules is a question of law that we review de novo.").

9. *Marcia V. v. State, Office of Children's Servs.,* 201 P.3d 496, 507 (Alaska 2009).

10. *Ted W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 204 P.3d 333, 337 (Alaska 2009).

in a CINA case.[11] The trial court must find by clear and convincing evidence that: (1) the child is in need of aid under AS 47.10.011;[12] (2) the parent has not remedied the conduct or conditions in the home that place the child at substantial risk of physical or mental injury or has failed to do so within a reasonable time;[13] and (3) OCS has made active but unsuccessful efforts to provide services and programs designed to prevent the Indian family's breakup.[14] The trial court must find by a preponderance of the evidence that (4) termination of parental rights is in the child's best interests.[15] Finally, the trial court must find by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that (5) the Indian child is likely to suffer serious emotional or physical harm if the child remains in the parent's custody.[16] Sandy and Leo challenge the trial court's active efforts finding and the sufficiency of the expert testimony.

### A. The Trial Court's Active Efforts Finding Was Not Erroneous.

ICWA requires that before a court may terminate parental rights to an Indian child, OCS must have made "active efforts ... to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[17] Under Alaska Child in Need of Aid Rule 18(c)(2)(B), the trial court's active efforts finding must be supported by clear and convincing evidence.

Sandy and Leo argue that the trial court did not make the required active efforts finding. They correctly point out that the trial court's initial written order terminating their parental rights lacks any reference to OCS's active efforts. But as OCS explains, the trial court made clear in its September 29, 2008 order that it was "only addressing the issues that [were] in dispute" and that it was "adopt[ing] the State's arguments as to all uncontested issues." Neither parent contested whether OCS made active efforts during their closing arguments or in their post-trial briefing. In fact, Leo's attorney told the trial court to "skip" the question whether OCS had proved by "clear and convincing evidence active efforts were made to provide remedial services" because "[w]e're okay with that." In failing to object when Leo's attorney conceded that OCS had met its active efforts burden and in contesting only the finding concerning whether the parents remedied within a reasonable time their conduct that put their children at substantial risk of harm, Sandy did not indicate that she disagreed with Leo and OCS that OCS had made active efforts to prevent the family's breakup. Sandy's silence certainly could have been taken as acquiescence in Leo's position that this issue was not in dispute.

In any event, the trial court entered a second written order that found that OCS had made active efforts and that provided support for its finding.[18] The trial court found "[b]y clear and convincing evidence,

**11.** *See* 25 U.S.C. § 1912(d), (f) (2006) (listing required findings to terminate parental rights to an Indian child); AS 47.10.088 (listing required findings to terminate parental rights to a child); CINA Rule 18(c) (listing required findings to terminate parental rights to a child, including additional requirements if the child is an Indian child).

**12.** AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

**13.** AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(i)-(ii).

**14.** 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

**15.** CINA Rule 18(c)(3).

**16.** 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

**17.** 25 U.S.C. § 1912(d).

**18.** *Cf. Stone v. Stone*, Mem. Op. & J. No. 1341, 2009 WL 1564154, at *3–4 (Alaska, June 3, 2009) (holding that the superior court did not abuse its discretion when it made supplemental oral findings five days after it had made its initial oral findings); *D.H. v. State, Dep't of Health & Soc. Servs.*, 929 P.2d 650, 654–55 (Alaska 1996) (affirming the trial court's finding concerning the State's reunification efforts, which was the sole additional finding included in the trial court's amended order). In their briefing and during oral argument, the parents repeatedly described the trial court's second written order as a "form order," which is in reference to the fact that the order was submitted by OCS and similar to proposed orders submitted by OCS in other cases. Because Alaska Civil

[that] active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family" and that "[t]hese efforts have proven unsuccessful." In support of its finding, the trial court highlighted OCS's efforts to "contact[ ] and communicat[e] with the parents," schedule visitation with their children, and OCS's "attempts to get the parents into treatment programs." Thus, it is clear that the trial court made the required active efforts finding.

▇▇▇ We turn next to the parents' argument that the trial court's active efforts finding was insufficient with respect to their daughter Sarah. We evaluate OCS's efforts to reunite an Indian family on a case-by-case basis.[19] Although there is "no pat formula ... for distinguishing between active and passive efforts," we have recognized that what is critical is OCS's involvement with a parent after it has drawn up the parent's case plan.[20] OCS makes active efforts to reunite a family when it helps the parents develop the resources necessary to satisfy their case plans, but its efforts are passive when it requires the parents to perform these tasks on their own.[21] A parent's willingness to cooperate is relevant to the scope of active efforts required.[22] "Where services have been provided and a parent has demonstrated a lack of willingness to participate or take any steps to improve, [we have] excused minor failures by the state and rejected arguments that the state could possibly have done more." [23] In evaluating whether OCS has taken active efforts, we consider OCS's "involvement in its entirety." [24]

▇▇▇ Sandy and Leo argue that the facts fail to support an active efforts finding for their youngest daughter, Sarah.[25] The question before us is a narrow one: When a child

Rule 78(a) requires "counsel for the successful party" to "prepare in writing and file ... proposed findings of fact, conclusions of law, judgments and orders," OCS properly submitted a proposed order with factual findings and legal conclusions that terminated Sandy's and Leo's parental rights after the trial court entered its initial written order that decided each of the disputed issues in OCS's favor. As Sandy's counsel acknowledged during oral argument, once the trial court signed OCS's proposed order, it was the court's order. *See Indus. Indem. Co. v. Wick Constr. Co.*, 680 P.2d 1100, 1108 (Alaska 1984) ("A trial court is ... entitled to adopt findings and conclusions · prepared by counsel, so long as they reflect the court's independent view of the weight of the evidence.").

**19.** *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1021 (Alaska 2009).

**20.** *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (internal quotation marks omitted).

**21.** *Id.* (citing Craig J. Dorsay, The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual 157–58 (1984)).

**22.** *Id.* at 262; *see· also N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 603 (Alaska 2001) ("This court has held that a parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts."); *In re J.W.*, 921 P.2d 604, 609 (Alaska 1996) (determining that OCS's "less active efforts" after the father moved "were justifiable in light of [his] continuing unwillingness to participate in treatment in any meaningful or ongoing way").

**23.** *Ben M.*, 204 P.3d at 1021.

**24.** *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008).

**25.** The parents also argue that OCS conceded this at trial when it discussed OCS's involvement with the parents in its opening argument:

> I've been doing this case for about two and a half years now on the eldest daughter. We've had two and a half years to correct the behaviors. That[ ] hasn't happened, which is why we're seeking termination today. And on the youngest girl, ... it's a continuation of these problems that have been going on for the last two and a half years. The department had to take custody [of Sarah], in December, for drinking by both parents. The department doesn't see a need to work with the family on this particular child given its history of two and a half years.
> The most recent removal shows that the history of CINA conditions persist.

But as OCS responds and as we discuss in greater detail below, OCS was arguing, as it continues to argue on appeal, that it made active efforts with regard to Sarah in light of the parents' history of failing to cooperate and to complete substance abuse treatment as well as its efforts between Sarah's birth and her removal from their care.

is born while OCS is involved with the family in an ongoing case, should the trial court view OCS's efforts toward each child in isolation rather than in the context of its efforts toward all of the children? The answer to that question is "no." The trial court properly considered all of OCS's efforts from the time that it first became involved with the family in September 2005 when it filed an emergency petition for adjudication of Kathy as in need of aid and for temporary custody until the trial on termination of Sandy's and Leo's parental rights began in April 2008.

We addressed a similar issue in *E.A. v. State, Division of Family & Youth Services.*[26] In *E.A.*, a mother relinquished her parental rights to each of her five children except for her six-year-old son.[27] In the case to terminate her parental rights to that son, the mother pointed to the failure of the Division of Family and Youth Services (DFYS), which is now known as the Office of Children's Services (OCS),[28] to make active efforts during a seven-month period to support her argument that DFYS had failed to provide active efforts toward unifying her with her son.[29] We determined that it was proper for the trial court to "consider the degree of the state's efforts to prevent the breakup of the entire family in assessing whether that effort was sufficient under ICWA" and that DFYS's efforts regarding her son were active in light of the totality of DFYS's efforts during its involvement with her family.[30]

The trial court's finding that OCS made active but unsuccessful efforts to prevent the breakup of Sandy and Leo's family is amply supported by the record. Before Sarah was born, OCS tried to provide remedial services and rehabilitative programs designed to prevent the termination of Sandy's relationship with Vicki and Kathy that included enrolling Sandy and Kathy in the Early Learning Family program, identifying treatment programs that allow participants to have their children with them, helping Sandy apply for an inpatient program in Fairbanks, scheduling supervised visits with Vicki and Kathy, and making repeated and varied efforts to contact and communicate with Sandy. OCS also made efforts to provide remedial services and rehabilitative programs designed to prevent the termination of Leo's relationship with Vicki that included scheduling two appointments for substance abuse assessments, scheduling supervised visits with Vicki, and making repeated and varied efforts to contact and communicate with him.

But OCS's efforts were hindered by the parents' lack of cooperation, which was largely due to their failure to acknowledge their problems with alcohol as well as their desire to relinquish their parental rights to Vicki and Kathy. Sandy acknowledges in her opening brief that "[i]n this case, it is undisputed that, for the first two children, [she] did not entirely cooperate with the treatment she clearly needed." Sandy twice declined substance abuse treatment when it was available to her, and on the two occasions when she entered treatment, she left without completing the programs. Leo failed to attend the two appointments for substance abuse assessments that OCS had made for him before Sarah was born and did not receive an assessment or participate in treatment until after Sarah was removed from his care. And despite having spent nearly three weeks in

**26.** 46 P.3d 986 (Alaska 2002).

**27.** *Id.* at 988 & n. 1.

**28.** *Smith v. Stafford*, 189 P.3d 1065, 1068 (Alaska 2008).

**29.** *E.A.*, 46 P.3d at 990.

**30.** *Id.* at 990–91; *see also Kyra K. v. State, Office of Children's Servs.*, Mem. Op. & J. No. 11426, 2005 WL 1189553, at *1–2 (Alaska, May 18, 2005) (holding that the superior court did not err

in finding that OCS had made active efforts toward the mother's youngest child in light of "the total history" of OCS's efforts during its fourteen-year involvement with her family); *N.A. v. State, Dep't of Health & Youth Servs.*, 19 P.3d 597, 598–99, 603–04 (Alaska 2001) (highlighting many of DFYS's efforts throughout its involvement with the mother and her five children, including efforts made before her two youngest daughters were born, to hold that DFYS's efforts toward a mother's two youngest daughters were "more than active" and in fact "exemplary").

residential treatment for substance abuse, Leo testified at the trial that he was not dependent on alcohol and that he had never placed his need for alcohol before the needs of his children.

Following Sarah's birth, her parents' unwillingness to cooperate continued to impede OCS's efforts to guide them through their case plans. Though Sandy and Leo had told their case worker that "they had given up on the older two children" and that they would focus their efforts on retaining the new baby, a police officer reported that Sandy was intoxicated when he saw her four days before Sarah's birth. On August 6 Leo was arrested for disorderly conduct, and on August 14 a police officer found Sandy passed out in the road.

The case worker responded to the reports of these alcohol-related incidents involving Sandy and Leo by visiting their home. But Sandy declined to talk with the case worker, and Leo did not address her concerns regarding their alcohol consumption. According to the case worker, "they weren't interested in engaging in services. They felt they didn't have a problem." The case worker visited the parents' home again in October. Yet this time Leo declined to talk to the case worker, and Sandy claimed that she was not drinking and did not have a substance abuse problem. In November the case worker called the parents and visited them, but they had not made progress in their treatment, and Leo did not appear to be any more receptive to OCS's efforts. As Sandy's attorney conceded at oral argument before us on appeal, "the State clearly wanted to at least try. They kept the child in the home for a few months until [Sandy] got drunk."

OCS removed Sarah from Sandy and Leo's care after her babysitter dropped her off at a party where they were both intoxicated. Between Sarah's removal in December 2007 and commencement of the trial on termination of Sandy's and Leo's parental rights in April 2008, it does not appear that OCS was involved with the parents. But OCS's failure to continue its efforts toward the family during those four months is insignificant in light of the substantial efforts that OCS made to assist the parents in receiving substance abuse assessments and treatment, schedule visitation with their children, and communicate with them in a variety of ways that were often rebuffed or ignored.

We conclude that in this case the trial court properly took into account all of OCS's efforts on behalf of the entire family in determining that active efforts were made on Sarah's behalf. We agree with OCS's view, expressed at oral argument, that the determination of whether OCS may rely on active efforts made on behalf of older children in support of a petition to terminate parental rights as to a younger child, born after those efforts were made, is "heavily fact dependent." In this case, OCS was justified in relying in part on the efforts it made in Kathy's and Vicki's cases in its petition to terminate parental rights as to Sarah. There was no interval between the older siblings' CINA proceedings and the CINA proceedings for Sarah, and the evidence established that the extensive efforts OCS had made with respect to the older girls in the nearly two years before Sarah's birth did not effect a change in the parents' conduct toward any of their children. We therefore conclude that the trial court did not err in finding that OCS made active but unsuccessful efforts to prevent the breakup of Sandy and Leo's family.

**B. The Trial Court Did Not Err in Finding by Evidence Beyond a Reasonable Doubt, Including Dr. Droby's Testimony, that Continued Custody by the Parents Would Likely Harm the Children.**

ICWA requires that before a court may terminate parental rights to an Indian child, the court must find "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or

Indian custodian is likely to result in serious emotional or physical damage to the child." [31] The court's finding may be supported "through expert testimony alone or through aggregating expert testimony with other evidence such as testimony of lay witnesses." [32]

The parents contest the qualifications of Dr. Droby as the State's ICWA-qualified expert and express concern that his testimony was by phone. The parents argue that Dr. Droby "was not qualified as an expert in child development, alcohol treatment or abuse, or on any subject specifically facing the court." But as OCS points out, Dr. Droby was qualified as an expert in psychology and his testimony was well within his expertise. At trial Dr. Droby addressed the psychological harm that the children have suffered and would likely continue to suffer if they were returned to Sandy and Leo's care and their parents continued to drink.

 Sandy further argues in her reply brief that even if Dr. Droby was qualified under the Alaska Rules of Evidence, "testimony from an expert who is generally qualified to testify under the Rules of Evidence is not sufficient to meet the requirements of the Indian Child Welfare Act." Sandy cites *Marcia V. v. State, Office of Children's Services,* in which we explained that although "ICWA § 1912(f) heightens the requirements for an expert's qualifications beyond those normally required to qualify an expert," one way to meet ICWA's requirements is "by virtue of substantial education in the area of [the expert's] specialty. The legislative history of ICWA provides further guidance, stating that the education and training of the expert should constitute 'expertise beyond the normal social worker qualifications.' " [33] Having earned master's and doctorate degrees in clinical psychology, Dr. Droby re-

ceived "substantial education" in his specialty of psychology that meets this standard.

 The parents also claim that Dr. Droby's testimony was "compromised by the fact that he appeared telephonically," but they fail to cite any authority in support of this contention. Although Sandy asserts in her reply brief that she is not arguing that "the trial court erred in allowing Dr. Droby to testify by telephone under CINA Rule 3(g)," she subsequently complains that "[t]he psychologist literally phoned it in from Nome." Dr. Droby's testimony by phone was proper under CINA Rule 3(g), which provides that "[t]he court may conduct any hearing with telephonic participation by one or more parties, counsel, witnesses, foster parents or out-of-home care providers, or the judge."

 Sandy and Leo raise their objections to Dr. Droby's qualifications as well as his telephonic testimony for the first time on appeal. We will not review issues that were not raised below absent plain error, which is an obvious mistake "creat[ing] a high likelihood that injustice has resulted." [34] The trial court made no mistake in qualifying Dr. Droby as an expert in psychology and in permitting his testimony by phone. Thus, there was no plain error.

 Sandy and Leo's final challenge goes to the sufficiency of Dr. Droby's testimony. They argue that his testimony failed to satisfy the standards of ICWA because it consisted of generalizations due to his lack of personal knowledge of the family. But Dr. Droby's testimony is like that of Dr. Michael Rose in *Ben M. v. State, Department of Health & Social Services, Office of Children's Services,* in which we rejected a father's argument that the trial court errone-

---

**31.** 25 U.S.C. § 1912(f) (2006).

**32.** *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 204 P.3d 1013, 1020 (Alaska 2009).

**33.** 201 P.3d 496, 504 (Alaska 2009) (quoting H.R. Rep. No. 95–1386, at 22 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7545).

**34.** *See Ted W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 204 P.3d 333, 337 (Alaska 2009) (internal quotation marks omitted).

ously relied on the testimony of an expert who had not evaluated him or his daughter.[35] We observed that "[i]t is possible that Dr. Rose's testimony would have been stronger or more detailed had he evaluated [the father] in person" but emphasized that "[o]ur case law is clear that in-person meetings are not required and the requirement for expert testimony is that it support the ultimate conclusion."[36] We concluded that Dr. Rose's testimony was not "so vague and generalized" or contrary to other evidence presented at trial "that the trial court clearly erred in according weight to it."[37] Dr. Rose testified that the father was likely to relapse based on the father's treatment and relapse history and identified likely problems faced by parents who care for their children while intoxicated.[38] Dr. Rose further testified that the father needed to resolve his psychological problems and dysfunctional personality features reflected in his criminal history and that "children exposed to domestic violence can suffer negative effects to their self-esteem and emotional stability."[39] Yet Dr. Rose was explicit that without examining the father he could not diagnose him with any particular disorder.[40]

Here, Dr. Droby's testimony was grounded in the facts and issues of this case. Dr. Droby testified that his review of the materials provided by OCS suggested that Sandy and Leo had "a strong orientation towards using alcohol at the expense of parenting," though he acknowledged that because he had not directly evaluated the family members, he could not diagnose the parents' consumption of alcohol as either alcohol dependent or alcohol abuse. Dr. Droby cited the parents' criminal records, their missed visits with their children, and the incident that led to Sarah's removal as examples of their behav-

ior that suggested that they had an alcohol problem. Dr. Droby further testified that "[i]t seems ... from the treatment notes on the children that they have been affected emotionally and that they have suffered, to some extent, emotionally from their relationship with their parents." In particular, Dr. Droby mentioned Vicki's response to seeing her father push down her mother and threaten to kill her, and Vicki's diagnosis of post-traumatic stress disorder. Dr. Droby explained how parents' alcohol problems can hinder bonds between them and their children and can cause the children to be anxious, insecure, and depressed. Finally, after Dr. Droby was told of the parents' participation in treatment for the past sixty to ninety days, he testified that if they were released and continued to drink, the children might be at harm. Dr. Droby also discussed the likely adjustment problems that the children would experience if they were returned to their parents after their parents completed eighteen months of treatment and six months of being sober in the community or if their parents relapsed and the children were again removed from their parents' care.

Dr. Droby's testimony is also consistent with the evidence that the trial court cited in finding that the children would likely suffer serious harm if returned to Sandy and Leo's care. In support of Dr. Droby's conclusions, the trial court cited: the foster mother's testimony about Vicki's displays of sadness and insecurity related to her jealousy of her foster mother's natural children, which had improved significantly during her time with her foster family; the treatment plan and mental status evaluation for Vicki, which contained her diagnosis of post-traumatic stress disorder and adjustment disorder; the guardian ad litem's December 2006 pre-dis-

**35.** 204 P.3d at 1019–21.

**36.** *Id.* at 1020; *accord Marcia V.,* 201 P.3d at 507 (explaining that pre-trial interviews of the family members are not required when the expert's testimony is sufficiently grounded in the case's particular facts and issues but that an expert's testimony may be weakened by exclusive reliance on the case file).

**37.** *Ben M.,* 204 P.3d at 1020–21.

**38.** *Id.* at 1020.

**39.** *Id.* at 1020–21.

**40.** *Id.* at 1021.

position report that mentioned Vicki's bed-wetting problem at the age of five; the guardian ad litem's February 2006 pre-disposition report that discussed Kathy's assessments, which determined that she had delays in various areas, including language; the foster mother's testimony about Kathy's inability to count past two when she was about four years old and about her progress since living with her foster family; and Sarah's young age and need to attach with an adult caregiver to prevent her from suffering significant emotional damage, based on legislative findings concerning the attachment process of children under the age of six.[41]

Because Dr. Droby's testimony is particular to facts and issues in this case and consistent with the other evidence presented at trial, the superior court did not err when it relied on his testimony in combination with other evidence to find beyond a reasonable doubt that "[b]ased upon the ages and devel-opmental needs of the children and the parents' history of unsuccessful engagement in treatment, . . . continued custody by the parents would result in emotional harm to the children." [42]

## V. CONCLUSION

For these reasons, we AFFIRM the trial court's termination of Sandy's and Leo's parental rights to their children.

---

**41.** *See* AS 47.05.065(5)(A)-(C) (discussing the problems associated with children who have not attached with an adult caregiver before they are six years old and the importance of expedited placement in permanent homes for these children).

**42.** Because we conclude that the parents' allegations of error are unfounded, their argument that they were denied due process by the cumulative effect of these alleged errors is without merit.